In the Matter of GARDINIER, INC., et al., Debtor.

**INTERNATIONAL MINERALS AND CHEMICAL CORPORATION, Plaintiff,**

v.

**GARDINIER, INC.; Gardinier Petroleum, Inc.; Gardinier Resorts Corp.; Gardinier International Sales Corp.; Gardinier Big River International Sales Corp.; Citibank, N.A., individually and as agent for long term lenders; Southeast Bank, N.A., individually and as agent for short term lenders; Phosphate Rock Export Association and Jack Noonan, Defendants.**

Bankruptcy Nos. 85–329 through 85–333. Adv. No. 85–58.

United States Bankruptcy Court, M.D. Florida, Tampa Division.

May 16, 1985.

Gregory C. Yadley, Shackleford, Farrior, Stallings & Evans, P.A., Tampa, Fla., Ricardo Torres, Jr., David Pollack, Stroock & Stroock & Lavan, Miami, Fla., for Southeast Bank.

Barry N. Siedel, Levin & Weintraub & Crames, New York City, Douglas McClurg, Holland & Knight, P.A., Tampa, Fla., for debtor.

Jerry Neal, Foley, Neal & Slade, P.A., Tampa, Fla., for Phosrock.

Robert Soriano, Carlton, Fields, Ward, Emanuel, Smith & Cutler, P.A., Tampa, Fla., for Citibank.

Jack Noonan, Tampa, Fla., pro se.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND MEMORANDUM OPINION

ALEXANDER L. PASKAY, Chief Judge.

THIS IS a Chapter 11 case and the matter under consideration is a Complaint filed by International Minerals and Chemical Corporation (IMC) against five related debtors referred to collectively as Gardinier and also against Citibank, N.A.; Southeast Bank, N.A., Phosphate Rock Export Association (Phosrock) and Jack Noonan. Phosrock and Jack Noonan are no longer Defendants, however, because the Plaintiff voluntarily withdrew its claims against those parties. By its Complaint, IMC seeks an Order from this Court directing that certain funds presently held in escrow be turned over to IMC. The facts relevant to the resolution of the controversy under consideration can be summarized as follows:

Phosrock is a non-profit corporation formed by producers of phosphate and related products. It is operated for the sole purpose of acting as a sales agent for its members on international sales. All of Phosrock's members are suppliers of phosphate rock and use Phosrock to negotiate prices, arrange shipping and so forth, on foreign sales.

At the beginning of each year, members of Phosrock are assigned an allocation which determines the percentage of the total product sold by Phosrock which each company may supply in the coming year. The allocation is based on each member's production for the previous three years in addition to other less important factors. At the start of each year, Phosrock also fixes the price to be paid to its members for phosphate rock of varying qualities. This is the price the member supplier receives when it actually makes delivery to Phosrock. If, at the end of the year, the average price actually charged to customers by Phosrock was higher than the price fixed at the start of the year, then the overage is divided among Phosrock's members. Gardinier and IMC are both members of Phosrock.

In September, 1984 it became apparent that Gardinier would not be able to fill its allocation of a particular grade of phosphate rock. Mr. James Fry, a vice president with IMC, contacted H. Allen Dahlbach, the Vice President of Marketing with Gardinier and inquired into the possibility of IMC supplying phosphate rock to Phosrock using Gardinier's allocation. IMC offered to compensate Gardinier $1 per ton for each ton that IMC supplied to Phosrock using Gardinier's allocation. Mr. Dahlbach attempted to negotiate a better deal for Gardinier but eventually agreed to the $1 per ton figure originally offered by IMC. At Mr. Dahlbach's instructions, a telex was sent to Larry Peterson, a product manager for IMC to confirm the agreement. The telex read as follows:

"This confirms the recent agreement reached between Al Dahlbach and Larry Frye whereby IMCC will supply to Gardinier, Inc. spot tonnages of 68% or higher BPL dry phosphate rock for application

to Gardinier orders from Phosphate Rock Export Association (Phosrock). Such agreement shall run through December 31, 1984. Purchase price shall be $1.00 per metrick ton less than what Gardinier bills Phosrock for subject orders/shipments. Gardinier will advise and discuss with IMCC the appropriate price and billing terms for each shipment. Payments to IMCC shall be identical to payment terms Gardinier has with Phosrock. Should subsequent adjustments be made to price charged by Gardinier to Phosrock it is agreed that IMCC charges to Gardinier shall be adjusted in an identical manner."

No objection to the telex was made by IMC and in fact the testimony of both parties reveals that the telex does indeed accurately reflect the agreement. As can be seen from the telex, the price of the phosphate rock was to be per the Phosrock pricing scheme. Gardinier was to be paid by Phosrock and then to remit to IMC the proceeds of the transaction less $1 per ton.

It is at this point that the controversy between the parties arises. IMC made a total of six deliveries to Phosrock using Gardinier's allocation and was paid for the first four. The deliveries were made as follows:

| Delivery Date | Ship Name |
|---|---|
| A. 9/30/84 | Youssoufia |
| B. 10/17/84 and 10/18/84 | Nordkyn |
| C. 11/5/84 | Bakar |
| D. 12/23/84 and 12/24/84 | Edco |
| E. 12/22/84 | Ziemia Olszt |
| F. 12/24/84 and 12/25/84 | Ziemis Bialo |

Gardinier treated the money due from Phosrock as a receivable on its books and also treated the obligation to remit the funds collected to IMC as an account payable. IMC treated the monies due from Gardinier as accounts receivable and invoiced Gardinier for the amounts due. IMC did not pay to Gardinier the $1 per ton fee, but rather, Gardinier simply deducted the amount due it under the agreement and then remitted the balance to IMC.

As noted above, IMC received the funds due for the first four shipments. Payment for the first shipment was made to IMC on November 7, 1984; seven days after the due date on the IMC invoice and eight days after the funds from Phosrock were received by Gardinier. Payment for the second shipment was received by IMC on November 20, 1984; four days after the due date per the IMC invoice and six days *before* the payment from Phosrock was received by Gardinier. The third shipment was paid for by Phosrock on December 27, 1984 and the funds were remitted to IMC on the same day. Payment to IMC was seven days after the due date on the invoice. The fourth shipment was paid for by Phosrock on January 22, 1985, the due date per the IMC invoice to Gardinier. Gardinier transferred the funds by wire to IMC on the same day. The fifth and sixth shipments were delivered to Phosrock, however, prior to any payment by Phosrock, Gardinier filed its petition under Chapter 11. The Plaintiffs then filed this law suit and pursuant to order of this Court, Phosrock paid the money owed for the fifth and sixth shipments into an escrow account pending the decision by this Court as to whom those funds belong.

Based upon the foregoing facts, it is Gardinier's contention that IMC is simply an unsecured creditor. IMC, however, claims that Gardinier held all funds as trustee for IMC under the theory of a resulting trust and, therefore, that the funds are not property of the estate. Alternatively, IMC contends that Gardinier was an agent of IMC and similarly that the funds are not property of the estate.

█ Based on the foregoing, this Court is satisfied that IMC cannot prevail on the theory that Gardinier acted as an agent for IMC. One of the basic premises of an agency relationship is the right of the principal to direct and control the activities of the agent. 2 Fla.Jur.2d, *Agency and Employment*, § 63 (1985). In the case at hand, it is clear that IMC exercised no control over the activities of Gardinier either with respect to the manner or time in

which Gardinier would remit funds to IMC or with respect to any other activities carried on by Gardinier relating to the transaction under consideration. Although sometime during the course of the arrangement the parties did agree that Gardinier would remit the funds to IMC on the same day that Gardinier received payment from Phosrock, this was only to accomodate IMC and not because Gardinier was under any duty to do so.

The next contention raised by IMC is that Gardinier was, in fact, a trustee holding the funds collected for the benefit of IMC. There is no question that there was no express trust agreement between the parties. However, IMC claims that because it supplied the phosphate rock for which Phosrock paid money to Gardinier, Gardinier holds the funds collected subject to a resulting trust.

Before a resulting trust will be found to exist, there must first be a showing that the parties intended to create a trust. *Wadlington v. Edwards*, 92 So.2d 629 (Fla.1957). The Defendants take the position that the parties must consciously intend that a trust should result. This is not the case. The parties need only to intend that one should hold legal title with the beneficial and equitable ownership being held by another. *Howell v. Fiore*, 210 So.2d 253 (Fla. 2d DCA 1968).

The case at hand differs from the typical case in that Gardinier did not first obtain the phosphate rock from IMC then transfer that rock to Phosrock in exchange for the funds. Instead, IMC delivered the rock directly to Phosrock who then transferred money to Gardinier. Although the mechanics of the transaction under consideration were somewhat different from that which typically gives rise to a resulting trust, it is nevertheless clear that Gardinier received the funds from Phosrock on account of the consideration (the phosphate rock) provided by IMC.

The fact that the funds were not segregated is of no moment. A resulting trust is one implied in law and presumed from all the surrounding circumstances. Although segregation of funds would lend weight to the proposition that there is a resulting trust, the lack of segregation does not detract from the conclusion that a resulting trust did arise. In addition, the Court does not consider the bookeeping methods used by the parties as a substantial factor in determining the relationship of the parties. In any event, the bookkeeping methods used are not inconsistent with the finding of a resulting trust.

Therefore, the Court is satisfied that the parties intended IMC to have the beneficial enjoyment of the funds subject only to the temporary legal rights of Gardinier. Therefore, the arrangement between the parties gave rise to a resulting trust.

Having determined that the funds were subject to a resulting trust, it is clear that they are not property of the estate.

A separate final judgment will be entered in accordance with the foregoing.