In re John White **MAURER, Jr.,** Heidi Wahl Maurer, Debtors.

Michael D. Maurer, Jr., Andrew Maurer, and Amy Maurer, an incompetent by and through her next best friend and mother, Nancy Miller, Plaintiffs,

v.

John W. Maurer, Jr. and Heidi Maurer, Defendants.

Bankruptcy No. 00–11426–8W3.
Adversary No. 00–696.

United States Bankruptcy Court, M.D. Florida, Tampa Division.

Sept. 27, 2001.

Ward A. Meythaler, Merkle & Magri, P.A., Tampa, FL, for Plaintiffs.

Allen K. von Spiegelfeld, Fowler, White, Tampa, FL, for Defendants.

Bernard J. Morse, Morse & Gomez, P.A., Tampa, FL, for Debtors.

**Memorandum Decision on Complaint Seeking Determination of Trust Relationship and Imposition of Equitable Lien**

MICHAEL G. WILLIAMSON, Bankruptcy Judge.

This adversary proceeding came on for trial on July 12 which continued on August

13, September 13, and September 24, 2001, on the plaintiffs' complaint seeking a determination that certain life insurance proceeds received by the defendants are held in trust for the benefit of the plaintiffs as more particularly described below. At the trial the court considered the testimony of 17 witnesses, received into evidence and reviewed numerous exhibits, and considered the various memoranda and legal authority cited by the respective parties. Based upon the foregoing as well as the court's determinations regarding the credibility of certain witnesses in areas in which there was substantial conflict in the testimony, the court finds for the plaintiffs on all counts of the complaint[1] based upon the following findings of fact and conclusions of law.

### Findings of Fact

1. *Description of Parties.*

Michael D. Maurer ("Michael Sr.") died on August 23, 1995, at the age of 51. At the time of his death, Michael Sr. had three children, Amy Maurer ("Amy"), Michael D. Maurer, Jr. ("Michael Jr.") and Andrew Maurer ("Andrew").[2]

The Maurer Children are the plaintiffs in this adversary proceeding. The Maurer Children's mother and former wife of Michael Sr. is Nancy Miller ("Nancy"). Nancy also appears as a plaintiff in this proceeding as Amy's "next friend and mother." Due to an accident that occurred on April 4, 1987, Amy is totally mentally and physically incompetent to act on her own behalf. Nancy and Michael

Sr. were married on August 4, 1968, and were divorced in November 1985. Michael Sr. never remarried.

The defendants in the adversary proceeding are the debtors, John W. Maurer, Jr. ("John") and his wife, Heidi Maurer ("Heidi"). John is Michael Sr.'s nephew and the son of Michael Sr.'s older brother, John W. Maurer ("Jack").

At the time of their divorce in 1985, Michael Sr. and Nancy resided with the Maurer Children in Tennessee. Following the divorce, Michael Sr., who had custody of the Maurer Children, moved to Tampa, Florida. Nancy moved to a nearby town in 1987. Michael Sr. retained custody of the Maurer Children until Michael Jr. and Andrew attained majority and until Amy's accident, following which she was placed in a nursing facility in the Tampa area.

2. *Purchase of the Policy from John.*

By all accounts, Michael Sr. was a model father. He loved and cared for the Maurer Children very much. All of the witnesses who were familiar with this relationship (Michael Jr., Andrew, Michael Sr.'s work associates and siblings, as well as John) testified regarding the close bond between Michael Sr. and the Maurer Children.

Michael Sr. was a special agent for the United States Department of the Treasury, Bureau of Alcohol, Tobacco and Firearms ("ATF"). It was a dangerous occupation. He was concerned about his personal safety and spoke of this on nu-

---

1. The complaint contains five counts for relief: (1) a declaration that certain life insurance proceeds are the subject of an express trust, resulting trust, or constructive trust; (2) the imposition of an equitable lien on any assets acquired by the defendants from the life insurance proceeds, and (3) a declaration that the plaintiffs are the rightful beneficiaries under the life insurance policy.

2. Collectively, Amy, Michael Jr., and Andrew shall be referred to as the "Maurer Children" unless the context indicates that the reference does not include Amy, who because of her incapacity, was not present at many of the events referred to in the court's findings of fact.

merous occasions to others. While he had been similarly employed in Tennessee, the investigations conducted by the ATF in Tennessee primarily involved unlawful production of alcohol. However, his position in Tampa involved criminals involved in organized crimes that were of a more violent nature. As a result, it was clear that Michael Sr. was concerned about his personal safety after he moved to Tampa and was particularly concerned that the Maurer Children be adequately provided for if he were to be killed.

In 1985, John, who was 33 years old at the time, filed an application with the State of Florida Department of Insurance to become licensed as an agent to sell life insurance. He did so under the guidance of Jim Black, a local insurance agent who was a friend of John's father, Jack. Jim Black employed John both during the time he was obtaining his license and after he obtained it until April of 1986 when John had grown disenchanted with the insurance business and went to work in his father's business.

John passed the required examination on his second attempt and obtained his license in either late 1985 or early 1986. One of his first customers was his uncle, Michael Sr. John was successful in selling Michael Sr. the Kansas City Life Insurance Company ("Kansas City Life") policy ("Policy") that is the subject matter of this adversary proceeding.

At the time, Michael Sr. had in place several life insurance policies including four with Ohio National Life Insurance Company, Knights of Columbus, and Metropolitan Life. These policies were maintained for the benefit of the Maurer Children. They were cancelled when the Policy was issued and their cash surrender values were used to defray the first year's lump-sum premium owed at the time of issuance of the Policy.

According to the application form that was completed by John in connection with the issuance of the Policy, a "capital needs analysis" was performed with respect to the insured, Michael Sr. The purpose of a "capital needs analysis" is to assure that the insured will leave sufficient assets to adequately provide the income needed for the insured's family. At the time, Amy was 15, Michael Jr. was 14, and Andrew was 10.

John testified that he was instructed by Michael Sr. to name himself as the sole beneficiary of the Policy. Jeanie Ann Harris, Michael Sr.'s sister, was named as contingent beneficiary. John testified that there was no discussion as to why he was named beneficiary and not the Maurer Children. He further testified that there was no discussion whatsoever on what would happen to the Maurer Children on Michael Sr.'s death. Even though the application for the Policy reflects that a capital needs analysis was done, he testified that the needs of the Maurer Children were simply not discussed. As stated by John at trial, "I was new in the business. I didn't think it was unusual."

The key factual issue in this case revolves around the reason for Michael Sr.'s naming John as his beneficiary as opposed to the Maurer Children. In this regard, it is absolutely clear from the testimony, the credibility of the witnesses, and all of the facts and circumstances and inferences to be drawn from those facts and circumstances that the only reason John was named as the sole beneficiary was to hold the proceeds in trust for the benefit of the Maurer Children.

At the time that the Policy was issued, Michael Sr. and John had a close relationship. It was Michael Sr.'s wish that if he were to die prior to the Maurer Children becoming adults, John would become the

guardian for the Maurer Children. Consistent with this, when the Policy was issued, John was named as beneficiary. In fact, John freely admits that he had numerous discussions with Michael Sr. that John would take care of the Maurer Children if something were to happen to Michael Sr.

It is simply not credible that there would not have been a discussion about the reasons why Michael Sr. was replacing policies set up for the benefit of his children with a policy for the benefit of his nephew. It is significant in this regard that John's former wife testified that on the day the policy was sold to Michael Sr., John mentioned that Michael Sr. had purchased the Policy from him. However, there was no mention made that Michael Sr. had not only bought a $100,000 policy but also that he had named John as beneficiary. It is not credible that John would not have mentioned an extraordinary event of being named as a beneficiary under the Policy for his benefit (as opposed to simply being named as the nominal beneficiary for the benefit of the Maurer Children). The only plausible explanation for John's failure to mention this fact to his wife at the time was that he was being named as beneficiary for the benefit of the Maurer Children.

The Policy was issued on February 12, 1986, and provided a death benefit of $100,000 and an accidental death benefit of an additional $100,000. The first year's premium for the Policy was funded by an up-front payment of $4,500 that was derived from cashing in the four existing policies. It also required annual payments of $900. At the time, Michael Sr.'s annual salary was $43,000. The accidental death benefit was twice the standard rate due to Michael Sr.'s high-risk profession.

Following his purchase of the Policy, Michael Sr. made numerous statements to his children, his former wife Nancy, and to his colleagues that he had taken care of his children through a policy obtained from John.

After the Maurer Children reached majority, Michael Sr. requested and was sent a change of beneficiary form from Kansas City Life. While he did not complete the form, the court notes that the evidence was clear that Michael Sr. was an alcoholic during the last years of his life and was otherwise extremely disorganized in his personal paperwork. His failure to return the change of beneficiary form is entirely consistent with these circumstances.

While Michael Sr.'s relationship with John was initially described as close, the relationship grew more distant in the later years. This was attributed to John's apparent lack of concern or desire to spend time visiting Amy after her accident. The fact that John's relationship with Michael Sr. was not as close in the later years before his death is not consistent with John's alternative argument: that even if Michael Sr. had originally named John as beneficiary for the benefit of the Maurer Children, he did not change the beneficiary after they attained majority because he wanted John to keep the death benefit rather than give it to the Maurer Children.

3. *Events After Michael Sr.'s Death.*

Michael Sr. died on August 23, 1995, following a fall that took place on August 13, 1995. The "Notice of Death" form was written up to reflect a telephonic report made by Jim Black to Kansas City Life about Michael Sr.'s death. It is dated August 29, 1995, the day following the memorial service for Michael Sr., at which Jim Black was present. The notice lists in the blank for name of the beneficiary or other person reporting the death of the insured: "3–children (divorced from Wife)/ Jim Black ... ex-KCL agent."

### a. *The September 12th Meeting.*

On September 12, 1985, a meeting was held in Jim Black's office at which Jim Black, Michael Jr., Andrew, and John attended. According to Jim Black, John had called to set up the meeting. Upon reviewing the Policy, Jim Black informed those present that John was the named beneficiary in the Policy.

John testified that he was surprised when he learned that he was the beneficiary of the Policy. The court infers from this the following: being named as a beneficiary of a policy in the amount of $100,000 is not something one forgets if indeed one is the intended beneficiary—as opposed to being named as beneficiary as part of a trust relationship. Common experience tells us that it would have been a significant event and one that would not be forgotten. The only logical conclusion is that John's surprise resulted from the fact that Michael Sr. had not changed the beneficiary designation following the Maurer Children having attained majority—not from learning for the first time that he, instead of his uncle's children, had been given what amounted to a $130,000 benefit from his uncle.

He immediately told Michael Jr. and Andrew, however, that the money from the policy was theirs and not his. John called Heidi from the meeting and told her that he had been named beneficiary on the Policy but was giving the money to the Maurer Children. She responded that he needed to think about whether he should give the insurance proceeds to the Maurer Children.

It is apparent that an issue arose as to what would happen to the proceeds if John were to die prior to his obtaining the proceeds and distributing them to the Maurer Children. The court infers that the concern was that in such event, Heidi would have inherited the proceeds and not given them to the Maurer Children. To address this concern, Jim Black drafted a will at the meeting that provided that if John died prior to the receipt of the proceeds, the proceeds would go to Michael Jr. and Andrew. John executed the will at the September 12th meeting. In addition, Michael Jr. and Andrew executed a letter designating Jim Black as their "AGENT OF RECORD."

There is an inconsistency between the plaintiffs' position that the proceeds were to benefit all of the Maurer Children, to include Amy, and the actions of Jim Black, John, and two of the Maurer Children, Michael Jr. and Andrew, to the exclusion of Amy, that could be construed to only be for the benefit of Michael Jr. and Andrew. For example, the will that John executed on September 12th only named Michael Jr. and Andrew and did not mention Amy. The court does not believe that should change the result of this case for several reasons:

First, this case depends on the intention of Michael Sr. when he bought the Policy up until the time of his death. Actions by Michael Jr. and Andrew, even in derogation of that intent, do not operate to change the result intended by Michael Sr.

Second, there is no evidence that if they had received the proceeds they would not have provided Amy her share. No doubt her mother could have and would have represented her interests if that eventuality had taken place. Amy's interests are certainly being well represented by her mother in this case.

Finally, because of the lack of formal documentation setting up the trust relationship, it is clear that work needed to be done to deal with the distribution of the proceeds for the benefit of the Maurer Children. It appears to the court that this was a "work in progress" and that Michael

Jr. and Andrew were relying on the expertise and advice of John and Jim Black to assist them in this regard.

After the meeting concluded, John, Michael Jr., and Andrew went out for a drink at a local bar. While there, John reiterated that the insurance proceeds belonged to them.

b. *John Changes His Mind.*

When John arrived at home that evening, he and Heidi again discussed the Policy. Coincidentally, at that time John and Heidi were experiencing financial difficulties. They had trouble obtaining financing for the purchase of a new home and had substantial outstanding debt obligations. Heidi expressed to John her opinion that if he was named as the beneficiary, then he was legally entitled to the proceeds and that he ought to reconsider any decision to give the money to the Maurer Children. At no time was Heidi apprised by John of the circumstances under which John had been named as beneficiary.

It also appears that on September 12th or immediately thereafter, Jim Black expressed to John that he should keep the insurance proceeds. Following the September 12th meeting, in addition to his daily discussions with Heidi, John also discussed the issue with his father and mother and other family members. It is noteworthy that this was the first time John's father and mother had learned that John was named as sole beneficiary under the Policy. It is simply not credible that a gift of this magnitude would not have been shared by John and Michael Sr. with other family members over the ten years since the Policy was issued (if in fact John was the intended beneficiary rather than one named for the benefit of the Maurer Children). In any event, "within a couple of days" of the September 12th meeting,

John informed Jim Black that he had decided to keep the Policy proceeds.

In furtherance of this decision, John requested that Jim Black represent him as agent of record in obtaining the Policy Proceeds. To memorialize this agreement, John executed a document titled "Agent of Record Agreement & Limited Contract for Services." This agreement is dated as having been entered into on the "Twelfth (12) Day of September, 1995," although John testified that the actual date of execution was not until he made the decision to keep the Policy proceeds a "couple of days" after the September 12th meeting.

At no time were the Maurer Children ever informed by Jim Black, John, or anyone else that Jim Black was no longer attempting to obtain the proceeds for their benefit but was now working with John to obtain the Policy proceeds for his benefit. It would be approximately six weeks until the Maurer Children learned about this fact. In the interim, Jim Black and John maintained the appearance that the Policy proceeds were being pursued on the Maurer Children's behalf.

For example, on September 13th Jim Black wrote to Kansas City Life enclosing the "Agent of Record" form as completed by Michael Jr. and Andrew. There was no subsequent communication stating that he was no longer acting on their behalf.

To the contrary, on September 18th, Jim Black again wrote Kansas City Life as a follow up to a conversation of that date regarding the fact that although the beneficiary of the Policy was actually John (and not the Maurer Children), John would distribute the proceeds to them. Jim Black—who was now working for John and knew that John intended to keep the proceeds—kept up the false appearances that the Maurer Children would ultimately receive the proceeds when he stated:

"I have met with all of the beneficiaries with the exception of Amy L. Maurer. Both sons (Michael & Andrew) fully accept John White Maurer, Jr., their uncle, as primary beneficiary. Final proceeds from [the Policy] will be distributed by John W. Maurer, Jr. to the two surviving sons as soon as possible."

Michael Jr. and Andrew received a copy of this letter. Clearly, this confirmed to them that all was proceeding as represented to them at the September 12th meeting, that is, the Policy proceeds would be distributed to the Maurer Children upon receipt from Kansas City Life. For his part, John, who also received a copy of the September 18th letter, made no attempt to apprise Michael Jr. and Andrew that he was going to keep the Policy proceeds rather than give them to the Maurer Children.

In light of John's statement that he had informed Jim Black of his intention to keep the proceeds "within a couple of days" of the September 12th meeting, the statement by Jim Black in his September 18th letter to Kansas City Life that the proceeds would be distributed by John "to the two surviving sons as soon as possible" was false when made.

### c. *The Investigation.*

It can reasonably be inferred that the questions regarding the beneficiary of the Policy (which prompted the call between Kansas City Life and Jim Black on September 18th and Jim Black's follow-up letter) also prompted the similar inquiries made by an investigator retained by Kansas City Life to investigate the death claim made by John as beneficiary under the Policy.

The investigation was initiated on September 18, 1995. The investigator was Linda Dougherty. In addition to an investigation as to the accident leading up to the death, she had been asked by Kansas City Life, "as a side issue why the children were not the beneficiaries." According to a representative of Kansas City Life, if an adversarial situation arose concerning who were the proper beneficiaries under the Policy, Kansas City Life would have interpled the funds pending a court determination of the proper beneficiary or beneficiaries.

During her investigation, Ms. Dougherty called Mr. Black and requested to speak to John Maurer.[3] Ms. Dougherty specifically

---

**3.** The Defendants objected to the admission of Linda Dougherty's testimony as it relates to her telephone conversation with John. John testified that he never spoke to Linda Dougherty on the telephone. Accordingly, for Linda Dougherty's testimony about this phone conversation to be admissible, John's identity must be *sufficiently authenticated under Fed. R.Evid.* 901(b)(6). Rule 901(a) provides that the requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims. By way of illustration, the rule gives as an example of authentication with respect to telephone conversations, "evidence that a call was made to the number assigned at the time by the telephone company to a particular person, or business, if ...

in the case of a person, circumstances including self-identification, show the person answering to be the one called...." Fed. R.Evid. 901(b)(6). In this case, Ms. Dougherty called a number provided by Kansas City Life. Jim Black answered the phone. She asked for John Maurer. An individual came on the phone immediately who identified himself as John Maurer. Thereafter, a conversation ensued with a person who clearly demonstrated familiarity with the Policy and the circumstances under which John was named as beneficiary instead of the Maurer Children. In light of this, it is clear that these circumstances satisfy the authentication requirements of Fed.R.Evid. 901(b)(6). *See U.S. v. Dhinsa,* 243 F.3d 635, 658–59 (2nd Cir. 2001)("While the mere assertion of the identity by a person talking on the telephone is not

inquired of John why he was the beneficiary on the Policy instead of the Maurer Children. John responded that the reason he was the beneficiary was that at the time that the Policy was issued, the Maurer Children were minors. He told the investigator that Michael Sr. was not comfortable making his former spouse, Nancy, the beneficiary so he chose another party. As testified to by the investigator, John Maurer indicated that he was "a caretaker, trustee type person for these funds."

#### d. *Letters Regarding the Proceeds.*

On September 19th, John executed a claim form. This was sent by Jim Black to Kansas City Life on September 20th with a notation, "Proceeds to be mailed to this office." On that same day, Jim Black wrote a letter to Michael Jr. and Andrew. In light of the circumstances—Jim Black's and John's silence regarding both John's decision to keep the proceeds and the fact that Jim Black was no longer working on their behalf, it can reasonably be inferred that the purpose of the letter was to further lull them into complacency until the money was received by John. Specifically,

the letter contains the following statements:

> "Generally, without interruptions, payout should follow with (sic) $^{10}\!/\!_{14}$ working days from date of receipt by the Kansas City Life Insurance Company.... From my experience, all of the Maurers are a very close family, even clanlike, especially the close relationship your father had with John Jr. From this unique relationship he is bound to both of you and is your best friend. He has only your best interest at heart and you should probably look to him for his guidance through these very difficult & trying times. I hope too, that you both count me amoung (sic) your friends, as I continue my efforts *on your behalf.*"

(Emphasis added.)

Contributing to the appearances that all was proceeding consistent with the statements made at the September 12th meeting was a second letter to the Maurer Children on September 20th written by Jim Black's office assistant and cousin. In it he states, "In helping Jim in his efforts of conserving your interests in the insurance proceeds and other related matters...." [4]

---

by itself sufficient to authenticate that person's identity, some additional evidence, which 'need not fall in[to] any set pattern' may provide the necessary foundation")(citing to *U.S. v. Khan,* 53 F.3d 507, 516 (2d Cir. 1995) (quoting Fed.R.Evid. 901(b)(6) advisory notes, ex. 6)); *U.S. v. Sawyer,* 607 F.2d 1190, 1192–93 (7th Cir.1979) (in a prosecution for failure to file tax returns, court held that phone conversation was authenticated when report by IRS agent listed the defendant's number and contained highly personal information); *Ciferni v. Standard Oil Corp.,* 715 F.Supp. 121 (E.D.Pa.1989) (transcript of phone conversation authenticated even when the person preparing report did not recall the conversation); *U.S. v. Khan,* 53 F.3d at 519 (citing to *U.S. v. Garrison,* 168 F.3d 1089, 1093 (8th Cir.1999)("a telephone conversation may be shown to have emanated from a particular person by virtue of its disclosing

knowledge of facts known peculiarly to him.")(quoting Fed.R.Evid. 901(b)(6) advisory committee notes, ex. 4)). *See also* Russell, Bankruptcy Evidence Manual, 2001 Ed., § 901.6 ("[a]uthenticating evidence may also be circumstantial such as the contents of the statement ...").

**4.** In making the findings of fact set forth in this decision, the court was presented with contradictory testimony from numerous witnesses. Accordingly, the court must make determinations as to the credibility of the respective witnesses. The major differences in the testimony with respect to what occurred was between the testimony of Jim Black and John on the one hand and the testimony of Michael Jr., Andrew, Nancy Miller, Jeanne Harris, the insurance investigator, and Michael Sr.'s coworkers. It is the court's conclusion after having observed closely the

### 4. The Debtors' Purchase of a New Home and the Debtors' Financial Condition.

Importantly, Michael Sr.'s death happened to coincide with John and Heidi's purchase of a new home. On August 14th, nine days before Michael Sr.'s death, John and Heidi entered into a contract for the purchase of a new home on Fox Squirrel Lane in Valrico, Florida ("New Home"). The purchase price for the New Home was $115,500. The terms of the contract for purchase required that the purchase price would be financed by a loan in the amount of $114,000.

On August 22, 1995, John and Heidi executed a residential loan application in connection with purchase of the New Home. In it they listed total assets of $145,131.31 and total liabilities of $92,775.20 resulting in a net worth of $52,356.11. Their largest asset making up this net worth was "Household Items" valued at $50,000. The August loan application also listed a second mortgage on their prior home and numerous credit card debts. The loan for which they were applying was in the amount of $118,965. Even though the purchase price of the home was only $115,500, due to various closing costs, they would still need cash for the closing in the amount of $1,837.08.

John and Heidi had problems qualifying for the loan. These problems resulted in the initial denial of the August loan application. It became clear that the purchase of the New House was dependent on obtaining the Policy proceeds to fund the closing. To assist John in his efforts to complete this purchase, on September 21st, Jim Black sent John a letter confirming that John was the beneficiary of the Policy, that a claim had been submitted on September 20th, and that payment was expected within the next ten (10) working days, or approximately October 2, 1995. In closing, Jim Black states, "Good luck & spend with gratitude."

Consistent with this, as part of the closing on the New Home, John and Heidi executed a new loan application which set forth an increase in their net worth by an "inheritance" of $130,000. The loan they were able to obtain also required them to increase the down payment to $19,439.35. The final calculation as set forth in the closing statement required them to fund $24,159.02 in order to purchase the New Home. Without the Policy proceeds, they did not have sufficient assets to fund this closing requirement and could not otherwise have closed on the New Home.

The closing on the purchase of John and Heidi's new home was to have occurred on Friday, October 6th. However, although issued on October 3, 1995, the Kansas City Life check in the amount of $133,387.64 made payable to John W. Maurer, Jr. as beneficiary under the Policy was not received by John until the following week. The check was deposited on October 10, 1995, into a joint savings account maintained by John and Heidi at the Valrico State Bank. Immediately following that deposit, a withdrawal was made in the form of a cashier's check payable to United Title Guaranty Co., the closing agent, in the amount of $24,162.02

In addition to the down payment on the New Home, approximately $12,000 of the Policy proceeds were used to pay home-related expenses such that the court finds that a total of $36,142 was used in connection with the acquisition and improvement of the New Home. The next largest use of the Policy proceeds was to pay debt. It is apparent that John and Heidi had accumulated substantial debts as of the time of

demeanor and candor of the witnesses that, to the extent there exist contradictions, the testimony of Jim Black and John was simply not credible.

the acquisition of the New Home. The majority of this debt, $29,005, had been incurred by Heidi.

The balance of the debt, approximately $28,000, consisted of joint loans and credit card debts incurred by both John and Heidi. Another $5,000 went to a lawyer to pursue an additional $100,000 in accidental death benefits under the Policy. The following table sets forth in detail these and other uses of the proceeds:

| Purpose | Amount |
| --- | --- |
| Home Purchase and Expenses | $36,142 |
| Heidi's Debts | $29,005 |
| Joint Credit Cards and Loans | $28,410 |
| Joint Certificate of Deposit | $20,000 |
| Loan to Family Business | $ 8,000 |
| Gifts and Family Reunion | $ 5,100 |
| Retainer for Lawyer | $ 5,000 |
| Jim Black Services & Insurance | $ 3,000 |
| John's Debts | $ 500 |

As referenced above, Jim Black received $3,000 of the insurance proceeds. He received $1,000 for assisting John to obtain the proceeds. In addition, according to the account provided by John and Heidi, they paid Jim Black's agency $2,000 for life insurance. They were able to pay for this insurance from the proceeds of the Policy. The date of the purchase of the insurance from Black was October 3, 1995.

On October 3, 1995, an attorney retained by John wrote Kansas City Life a letter requesting specific reasons why Kansas City Life was "hesitant to pay on the $100,000 Accidental Death Benefit" portion of the Policy. He requested their response within ten days. The court infers that the speed with which John was proceeding to press this additional claim (at a time that the Maurer Children still had not been informed about John's decision to keep the proceeds from the Policy) was motivated by a desire to obtain this additional benefit before they would have had an opportunity to protect their interests.

It was not until October 27th, six weeks after the September 12th meeting, that Michael Jr. first learned about the fact that John had decided to keep the Policy proceeds. This occurred after repeated calls to John went unanswered. Michael Jr. was finally successful in getting through to John by disguising his voice when he asked for John at Jim Black's office. Finally, on October 27th he got through and spoke to John who informed him that he had decided to keep the proceeds. This was after the proceeds had been paid to John and the closing on the New Home had been concluded on October 10th.

### Conclusions of Law

I. An Express Trust Was Created When the Policy was Issued.

■ There are six elements to the creation of a valid express trust, as aptly summarized by the court in *In re Smith*, 73 B.R. 211, 212 (Bankr.N.D.Fla.1986) (citing to 56 *Fla. Jur.2d Trusts § 6):*

(1) a person competent to create the trust;

(2) indication of intention to create the trust;

(3) property to which the trust may and does pertain;

(4) a definite and complete present disposition of that property;

(5) a provision, at least by implication, for the office of trustee ...; and

(6) a person capable of holding the equitable interest in the property as beneficiary.

The Plaintiffs in this case assert that an express trust has been created and they cite to *In re Smith* as support. In the *Smith* case, the court found that the debtor held only bare legal title to a vehicle that was titled in the debtor's name but purchased by her parents for their minor

granddaughter, the debtor's daughter. The *Smith* court found that an oral express trust was created and that the sole reason the debtor held legal title was to reduce the cost of insuring the vehicle. *Id.*

■ Similarly, in this case, all the elements of an oral express trust have been met. There was substantial competent evidence that Michael Sr. intended to create an oral express trust for his children. There is no dispute that Michael Sr. was competent and the evidence shows that he intended John to act in the role as a trustee for his children in receiving the proceeds from the Policy.[5]

II. The Policy Proceeds Are Held in a Resulting Trust for the Benefit of the Maurer Children.

■ As distinguished from an express trust, there are so-called implied trusts that rise by operation of law. One of the implied trusts that may be created is a resulting trust. A resulting trust is created when one party pays the consideration for the purchase of property but the title is taken in the name of another. *Smith*, 73 B.R. at 212 (citing *Socarras v. Yaque*, 452 So.2d 992 (Fla. 3rd DCA 1984)). In the creation of a resulting trust, it is essential that the parties intended to create the trust relationship and that the parties failed to execute the necessary documents or to establish adequate evidence of intent. *In re Goldstein*, 135 B.R. 703, 705 (Bankr. S.D.Fla.1992).

The quintessential illustration of a resulting trust is where one person pays for a piece of real estate while the title is held in another with both parties agreeing at that time that the property is to be held by the named grantee for the benefit of the unnamed beneficiary. *Binz v. Helvetia*

*Florida Enterprises, Inc.*, 104 So.2d 124, 127 (Fla. 3rd DCA 1958)("*Binz*")(internal citations omitted); *In re Gardinier, Inc.*, 49 B.R. 489, 492 (Bankr.M.D.Fla.1985) ("parties need only intend that one should hold legal title with the beneficial and equitable ownership being held by another" (internal citations omitted)).

■ There is no dispute that Michael Sr. paid for the insurance policy. There is compelling evidence that both parties agreed that the insurance proceeds were to be for the raising of Michael's minor children upon his death. At the time when Michael purchased the insurance, incorrect documents were executed in that the incorrect beneficiary was listed.

Since Michael Sr. intended for John to hold the insurance proceeds in trust for his children, the legally prudent method of naming the beneficiary would have been to, at the minimum, list John "as trustee for Michael Sr.'s children." Alternatively, he should have actually created a separate trust and named John as trustee and specifically name the trust as beneficiary (so called "pour-over trusts"). Accordingly, the court finds that the plaintiffs have met their burden to establish a resulting trust.

III. The Policy Proceeds are Held in a Constructive Trust for the Benefit of the Maurer Children.

■ Another type of implied trust is the constructive trust. This relationship deemed to exist by a court of equity "to prevent unjust enrichment of one person at the expense of another as a result of fraud, undue influence, abuse of confidence or mistake in the transaction that originates the problem." *Binz*, 104 So.2d at 127 (internal citations omitted). To im-

---

**5.** While this court need not further proceed with the analysis of the other trust theories advanced by the plaintiffs, the court finds it appropriate to continue in its analysis because, in the alternative, the plaintiffs would have prevailed under the other theories.

pose a constructive trust, the following elements must be present: (1) promise, express or implied; (2) transfer of the property and reliance thereon; (3) a confidential relationship; and (4) unjust enrichment. *Saporta v. Saporta*, 766 So.2d 379, 381 (Fla. 3rd DCA 2000).

■ Courts have imposed constructive trusts upon proceeds of life insurance policies when unintended persons have received such proceeds. *See, e.g., Holmes v. Holmes*, 463 So.2d 578 (Fla. 1st DCA 1985) and *Blaney v. McCluskey*, 529 So.2d 314 (Fla. 1st DCA 1988). Similarly, all the elements of a constructive trust are present in this case:

First, the court finds that there is clearly an express promise (at the time the insurance policy was purchased) that John was to use the proceeds in trust for Michael Sr.'s then minor children. While the dispute ultimately centers upon Michael Sr.'s intent after his children reached the age of majority, the court finds substantial competent evidence that he intended to give the proceeds to his children. Accordingly, an implied promise existed that John was to use the insurance proceeds for the benefit of Michael Sr.'s children regardless of their age.

As to the second element, it is clear that property was transferred in reliance of the promises. John was listed as the beneficiary in the life insurance policy.

As to the third element, it is also clear that a confidential relationship existed between the two parties by virtue of John's close familial relationship with the deceased at the time of the purchase of the Policy. Additionally, John held such a relationship by virtue of his status as an insurance agent who actually sold the policy to Michael Sr.

Based upon the evidence, the court finds that John and Heidi would be unjustly enriched if they were allowed to retain the proceeds of the Policy. It is clear that Michael Sr. merely intended for John to act in the capacity of a trustee for the benefit of his children. The Maurer Children were always intended as the ultimate beneficiaries, regardless of their ages at the time of his death.

After Michael Sr.'s death, John's initial reaction was to hand over the proceeds of the policy to the Maurer Children. In this court's opinion, this is evidence that John also understood his role as merely the trustee of the funds.

In conclusion, all the elements for the imposition of a constructive trust on the proceeds of the insurance policy for the benefit of Michael Sr.'s children have been met.

IV. Grounds Exist to Impose an Equitable Lien Upon the New Home.

■ The Plaintiffs seek an equitable lien to be imposed upon any assets derived from the proceeds of the insurance policy. When determining whether an equitable lien is appropriate, the courts must look to applicable state law. *In re Tsiolas*, 236 B.R. 85, 88 (Bankr.M.D.Fla.1999); *In re Diamond*, 196 B.R. 635, 639 (Bankr. S.D.Fla.1996). Under Florida law, equitable liens may be imposed if "the general considerations of right and justice dictate that one party has a special right to a particular property and where there is an absence of an available lien or no adequate remedy at law." *Tsiolas*, 236 B.R. at 89.

■ In this case, John's decision to keep the Policy proceeds in derogation of the terms under which they had been entrusted to him and subsequent conduct in not disclosing his decision to the Maurer Children was reprehensible conduct. John and, to a larger extent, Heidi, who owed the majority of the couple's debts that

were paid off from the Policy proceeds, were unjustly enriched as a result of this conduct. In such cases, the appropriate remedy is the imposition of an equitable lien on property, to include homestead property, that was obtained by these ill-gotten proceeds. *See, e.g., Palm Beach Savings & Loan Association, F.S.A. v. Fishbein,* 619 So.2d 267, 269 (Fla.1993); *Havoco of America, Ltd. v. Hill,* 790 So.2d 1018, 1026–28 (Fla.2001)(recognizing the continued viability of the equitable lien jurisprudence in situations involving fraud or egregious conduct in investing in, purchasing or improving a homestead).

Accordingly, the evidence compels an imposition of an equitable lien on any property obtained from the Policy proceeds. It would be unjust to allow John and Heidi to profit from their retention of the life insurance proceeds when it was the intent of the deceased that John act as trustee for his children.

 It appears that the only remaining asset acquired from the Policy proceeds that was still owned by John and Heidi as of the date of their bankruptcy filing was the New Home. The evidence shows that John and Heidi used the Policy proceeds for the purchase of the New Home and home-related expenses in the amount of $36,142. Accordingly, subject to a determination under Bankruptcy Code § 506 as to the value of the New Home on the date this case was filed, the plaintiffs shall have a secured claim in this case to the extent of the equity in the New Home not to exceed the amount of $36,142 plus interest from October 10, 1995 ("Lien Amount"). The balance will constitute an unsecured claim.[6]

 In addition to the imposition of an equitable lien, the plaintiffs seek an order requiring the sale of the New Home and the distribution of the Lien Amount to them from the proceeds of the sale. Since this adversary proceeding arises in the context of a Chapter 13 case, it is appropriate to afford the Debtors the opportunity to deal with the Lien Amount under their Chapter 13 plan.

If they are successful in confirming a plan that provides for payment of the Lien Amount consistent with the provisions of Chapter 13, then the court will not require the New Home to be sold in payment of the Lien Amount. If they are not successful in confirming such a plan, however, then the court will enforce the equitable lien consistent with Florida law dealing with the remedies available to one who holds an equitable lien.

 In this regard, as stated recently by the Florida Supreme Court, an equitable lien "... constitutes a charge or encumbrance upon the thing, so that the very thing itself may be proceeded against in an equitable action, and ... sold ... and its proceeds ... applied upon the demand of the creditor in whose favor the lien exists." *Havoco v. Hill,* 790 So.2d at 1024, n. 10 (*quoting from Jones v. Carpenter,* 90 Fla. 407, 106 So. 127 (1925)). Accordingly, un-

6. The plaintiffs timely filed a proof of claim in this case for the entire amount of the Policy proceeds. In light of the determinations made in this adversary proceeding, prior to confirmation of the Debtors' Chapter 13 Plan, the plaintiffs will need to amend their proof of claim setting out the portion of their claim that is secured by the equitable lien on the homestead with the balance to be an unsecured claim in the Debtors' Chapter 13 case.

In due course, the court may also have to deal with the Debtors' objection to the claim and a motion seeking a determination of the secured status of the plaintiffs' claim based on the value of the New Home and other encumbrances. These matters are not before the court in the context of this adversary proceeding but will need to be dealt with as separate contested matters as part of the administration of the Debtors' Chapter 13 case.

der the final judgment to be entered in connection with this memorandum decision, the court will reserve jurisdiction to order the sale of the New Home to pay the Lien Amount if it is not satisfactorily dealt with under the Debtors' Chapter 13 plan.

## V. Declaratory Relief.

Plaintiffs also seek a declaratory judgment from this court declaring that the Plaintiffs are the intended beneficiaries and the rightful owner of any claim or cause of action against Kansas City Life. Under this count, the plaintiffs may only prevail in part. The court will grant the Plaintiffs a declaratory judgment to the extent that they are the intended beneficiaries of the policy but will decline to rule on the rights to proceed against Kansas City Life because the issuer was not a party to the proceeding.

### *Conclusion*

It is clear to the court that under the facts of this case that the proceeds from the Policy were intended to be held in trust by John for the benefit of the Maurer Children. The retention of these proceeds by John and Heidi under these circumstances constitutes grounds for the imposition of an equitable lien on the homestead that they acquired and improved with the proceeds. The amount secured by the equitable lien must either be dealt with satisfactorily under their Chapter 13, or the homestead will be sold in payment of the amount secured by the equitable lien.

A separate and final judgment will be entered by this court containing terms consistent with this opinion to include a retention of jurisdiction to afford complete relief to the plaintiffs in this adversary proceeding.